# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**RANDY B. ARCHIQUETTE**

      **Petitioner,**

**v.**                                         **Case No. 8:17-cv-621-T-36TGW**

**SECRETARY, Department of Corrections,**

      **Respondent.**

_____/

# O R D E R

This cause comes before the Court on Randy B. Archiquette's petition for the writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. 1)  Archiquette challenges his state convictions for DUI manslaughter with leaving the scene of an accident, DUI manslaughter, DUI with property damage (three counts), and leaving the scene of an accident with property damage (two counts).  The Respondent concedes the petition's timeliness.  Upon consideration of the petition (Doc. 1), the response (Doc. 8), and the reply (Doc. 15) and in accordance with the *Rules Governing Section 2254 Cases in the United States District Courts*, the petition will be **DENIED**.

# FACTS[1]

On the afternoon of April 13, 2009, while driving his vehicle, Archiquette struck a car driven by Steven Goudie, causing damage to Goudie's vehicle.  Archiquette left the scene of the

---

[1] This factual summary derives from the factual basis presented by the prosecutor at Archiquette's change of plea hearing and the sentencing memorandum filed by Archiquette's trial counsel. (Respondent's Exhibit 9)

accident.  Within minutes of that accident Archiquette proceeded to strike a tractor trailer truck causing damage to the truck.  Again Archiquette left the scene and continued driving.  He next struck a car driven by Betty Williams, causing her vehicle to go off the road and hit a pole.  Williams sustained injuries that resulted in her death.  Undeterred, Archiquette continued driving into oncoming traffic and struck a vehicle driven by Brittany McFarland, causing her vehicle to be pushed into a tow truck and causing the tow truck to go off the road and hit a tree.  McFarland suffered injuries that resulted in her death. Archiquette's car eventually overturned and spun out of control for over 150 feet.  Archiquette was transported to the hospital but did not suffer any life-threatening injury.   A medical blood draw taken less than an hour after hitting McFarland's car showed that Archiquette had a blood alcohol content of .147 grams of alcohol per 100 milliliters of blood.[2]   A legal blood draw conducted more than two hours after the accidents showed that Archiquette had a blood alcohol level of 0.91.

Archiquette was arrested and charged with nine offenses:  DUI manslaughter (leaving the scene), vehicular homicide (leaving the scene), DUI manslaughter, vehicular homicide, DUI with property damage or personal injury (three counts), and leaving the scene of a crash with property damage (two counts).  Archiquette entered an open plea of guilty to seven of the charges:  DUI manslaughter (leaving the scene), DUI manslaughter, three counts of DUI with property damage and two counts of leaving the scene with property damage.  He was sentenced to 21.3 years imprisonment followed by 23.7 years of probation.

---

[2] Under Florida law, a person is considered under the influence of alcohol if he has a blood alcohol content of 0.08 or more grams of alcohol per milliliter of blood. Fla. Stat. § 316.193.

<u>**STANDARD OF REVIEW**</u>

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000). Section 2254(d), which creates a highly deferential standard for federal court review of a state court adjudication, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - - the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 526 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case. "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693. A federal court must afford due deference to a state court's decision. "AEDPA prevents defendants — and federal courts — from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). *See also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

The state appellate court affirmed the denial of Archiquette's Rule 3.850 motion. (Respondent's Exhibit 13) The state appellate court's affirmance warrants deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied*,

278 F.3d 1245 (2002), *cert. denied sub nom Wright v. Crosby*, 538 U.S. 906 (2003).  *See also*

*Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state

court has denied relief, it may be presumed that the state court adjudicated the claim on the merits

in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court.

> We now hold that review under § 2254(d)(1) is limited to the record
> that was before the state court that adjudicated the claim on the
> merits.  Section 2254(d)(1) refers, in the past tense, to a state-court
> adjudication that "resulted in" a decision that was contrary to, or
> "involved" an unreasonable application of, established law.  This
> backward-looking language requires an examination of the state-
> court decision at the time it was made.  It follows that the record
> under review is limited to the record in existence at that same time,
> i.e., the record before the state court.

*Pinholster*, 563 U.S. at 181–82.  Archiquette bears the burden of overcoming by clear and

convincing evidence a state court factual determination.  "[A] determination of a factual issue

made by a State court shall be presumed to be correct.  The applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence."

28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to a finding of fact but not to a

mixed determination of law and fact.  *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*,

534 U.S. 1046 (2001).

## STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Archiquette claims ineffective assistance of counsel, a difficult claim to sustain.  "[T]he

cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of

counsel are few and far between."  *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (*en

banc*) (quoting *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994)).  *Sims v. Singletary*, 155 F.3d

1297, 1305 (11th Cir. 1998), explains that *Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 690. *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690.

Archiquette must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." 466 U.S. at 691.

To meet this burden, Archiquette must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Archiquette cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are Interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Under 28 U.S.C. § 2254(d) Archiquette must prove that the state court's decision was "(1) . . . contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Sustaining a claim of ineffective assistance of counsel is very difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in

tandem, review is 'doubly' so." *Richter*, 562 U.S. at 106. *See also Pinholster*, 563 U.S. at 202 (a petitioner must overcome this "'doubly deferential' standard of *Strickland* and [the] AEDPA"), *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011) ("Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."), and *Pooler v. Sec'y, Dep't of Corr.*, 702 F.3d 1252, 1270 (11th Cir. 2012) ("Because we must view Pooler's ineffective counsel claim — which is governed by the deferential *Strickland* test — through the lens of AEDPA deference, the resulting standard of review is "doubly deferential."), *cert. denied*, 134 S. Ct. 191 (2013).

Although the state court's order omits citing *Strickland* as the standard for an ineffective assistance of counsel claim, no explicit citation is required. A state court need not cite Supreme Court precedent (or even be aware of it) if the decision is consistent with the precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Parker v. Sec'y of Dep't of Corr.*, 331 F.3d 764, 775–86 (11th Cir. 2003). In Florida, *Strickland* governs an ineffective assistance of counsel claim. *Walls v. State*, 926 So. 2d 1156 (Fla. 2006). The state post-conviction court analyzed Archiquette's ineffective assistance of counsel claims consistent with *Strickland*. Consequently, Archiquette must show that the state court's ruling was either an unreasonable application of *Strickland's* principle or an unreasonable determination of the facts. The presumption of correctness and the highly deferential standard of review requires that the analysis of each claim begin with the state court's analysis.

# I.    EXHAUSTION AND PROCEDURAL DEFAULT

Archiquette presents five grounds for relief.  He admits that three of the grounds alleging ineffective assistance of counsel are unexhausted and procedurally defaulted but argues entitlement to federal review under *Martinez v. Ryan*, 566 U.S. 1 (2012).

Before a federal court can grant  habeas relief, a petitioner must exhaust every available state court remedy for challenging his conviction, either on direct appeal or in a state post-conviction motion.  28 U.S.C. § 2254(b)(1)(A), (C).  "[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted).  To exhaust a claim, a petitioner must present the state court with both the particular legal basis for relief and the facts supporting the claim.  *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)).  The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief.  *Kelley v. Sec'y for Dep't of Cor*r., 377 F.3d 1317, 1344 (11th Cir. 2004).

The requirement that a petitioner exhaust each available state court remedy as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim.  28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971).  A petitioner may raise a federal claim in state court "by

citing in conjunction with the claim the federal source of law on which he relies or a case deciding such claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin*, 541 U.S. at 32.

"If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate not only that an error at the trial created the possibility of prejudice but that the error worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimension. *United States v. Frady*, 456 U.S. 152 (1982). In other words, a petitioner must show at least a reasonable probability of a different outcome. *Henderson*, 353 F.3d at 892.

Absent a showing of cause and prejudice, a petitioner may obtain federal habeas review of a procedurally defaulted claim only if review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 495 96 (1986). A fundamental miscarriage of justice occurs if a constitutional violation has probably resulted in the conviction of someone who is "actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). To meet the "fundamental miscarriage of justice" exception, Archiquette must show constitutional error coupled with "new reliable evidence — whether . . . exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." *Schlup*, 513 U.S. at 324.

**Ground Three**

Archiquette contends that his trial counsel rendered ineffective assistance by not moving the trial court for a presentence investigation report ("PSR") and by not presenting to the sentencing judge for mitigation the findings that would have been included in such report. Archiquette claims that "[c]ounsel knew that the Petitioner was a first time offender, a disabled combat veteran, home owner, held a government security clearance, and worked as a financial analyst for a major defense contractor. These factors should have compelled counsel to seek a PSR with the expectation that the report would have recommended a favorable sentence." (Doc. 1, p. 12–13) Archiquette asserts in his reply that "[t]he basis of the IAC claim here is counsel's deficient preparation for sentencing — it is the failure to request that [the] court order a PSR and not knowing the rules of court." (Doc. 15, p. 19) Archiquette contends that "[c]ounsel's failure . . . denied the Petitioner his right to due process and to effective assistance of counsel and deprived the court of making a fully informed sentencing decision." (Doc. 1, p. 13) He acknowledges that this ground is unexhausted and procedurally defaulted but asserts entitlement to federal review under *Martinez v. Ryan*, 566 U.S. 1 (2012).

*Martinez* recognizes a narrow exception to the exhaustion requirement announced in *Coleman v. Thompson*, 501 U.S. 722 (1991), regarding claims of ineffective assistance of trial counsel. *Martinez* holds that, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. at 17. A claim that lacks merit or is wholly without factual support is not "substantial." *See id*. at 15-16; *see also Allen v. Sec'y, Dep't of Corr.*, 767 F. App'x 786, 790 (11th

Cir. 2019) ("[T]o show that an underlying claim is substantial, the petitioner must show that reasonable jurists would debate its merits.") (citing *Hittson v. GDCP Warden*, 759 F.3d 1210, 1269–70 (11th Cir. 2014)).

Archiquette fails to show that his claim of ineffective assistance of counsel is "substantial." Archiquette assumes that his receiving a bottom-of-the-guidelines sentence "is precisely why a PSR could have had an impact on a more lenient sentence." (Doc. 15, p. 21)  Archiquette submits as an exhibit a copy of a PSR for a fellow inmate, Henry Sandoval, who was convicted of charges similar to Archiquette's: multiple counts of DUI manslaughter, DUI with serious bodily injury, and DUI with property damage/injury. (Doc. 1, attach. D, presentence investigation report of Henry Sandoval)  Archiquette believes that, because the Department of Corrections recommended a sentence of fifteen years imprisonment[3] for Sandoval, the Department of Corrections would have also recommended a lower sentence in his case. He argues that "[t]he difference between the contents of a PSR and counsel's presentation [at sentencing] is a recommended sentence by the Department of Corrections, which would have been lower than the guidelines if the sample PSR (i.e., Sandoval's PSR) provided holds true." (Doc. 15, p. 21)

Archiquette's argument that a PSR would have resulted in a lower sentence is speculative at best. Even assuming that he was entitled to a PSR[4] and that counsel performed deficiently by

---

[3] Archiquette states in his petition that Sandoval ultimately received a sentence of ten years imprisonment followed by twenty years of probation after Sandoval's attorney successfully moved for a downward departure. (Doc. 1, p. 13) Archiquette includes no details about Sandoval's crimes or Sandoval's criminal history and does not assert that he is similarly situated — aside from the types of crimes for which both he and Sandoval stand convicted — to Sandoval.

[4] Florida Rule of Criminal Procedure 3.710(a) (2011) provides:

> In all cases in which the court has discretion as to what sentence may be imposed, the court may refer the case to the Department of Corrections for investigation and recommendation. No sentence or sentences other than probation shall be imposed on any defendant found guilty of a first felony offense . . . until after such investigation has first been made and the recommendations of the Department of Corrections received and considered by the sentencing judge.

not requesting a PSR, Archiquette fails to demonstrate prejudice as *Strickland* requires. The information that Archiquette suggests should have "compelled" counsel to request a PSR — that he was a first time offender, a disabled combat veteran, a home owner, held a government security clearance, and worked as a financial analyst for a major defense contractor — was presented to the sentencing judge in counsel's sentencing memorandum, which the judge acknowledged that he read. Archiquette presents no evidence aside from his own unsupported contention that the Department of Corrections would or could have recommended a sentence below the minimum sentencing guidelines, which is the sentence the judge imposed. Consequently, Archiquette fails to establish that his claim is "substantial" under *Martinez* to overcome the procedural default of this ground of ineffective assistance of counsel. He cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Archiquette satisfies neither exception to procedural default, ground three is procedurally barred from federal review.

**Ground Four**

Archiquette contends that his trial counsel rendered ineffective assistance by not moving to correct sentencing errors under Florida Rule of Criminal Procedure 3.800(b)(1) or (b)(2) in the written probation order requiring Archiquette to pay for the monthly cost of drug testing and the cost of supervision, which conditions were allegedly not orally pronounced at sentencing.[5] Archiquette alleges that he faces approximately $27,000 in costs over the course of his

---

[5] During the sentencing hearing the trial judge announced that Archiquette will "be required to pay court costs, cost of prosecution, public defender fees." (Respondent's Exhibit 9a, transcript of February 11, 2011, sentencing hearing, p. 134). The written order of probation designates as a standard condition of probation that Archiquette "will pay the State of Florida the amount of $40.00 per month, as well as 4% surcharge, toward the cost of your supervision in accordance with s. 948.09, F.S., unless otherwise exempted in compliance with Florida Statutes." (Respondent's Exhibit 5, p. 2) The written order designates as a "special condition" of probation that Archiquette "will be required to pay for drug testing unless exempt by the Court." (*Id*. at p. 3)

incarceration and subsequent years of probation, a "substantial amount . . . especially since [he] is a disabled combat veteran." (Doc. 1, p. 16) He further alleges that "[h]ad counsel moved the court to correct the probationary costs under rule 3.800(b) . . . the costs would have been stricken in an amended order according to the Florida Supreme Court." (*Id*.)

Respondent correctly argues, and Archiquette concedes, that this ground of ineffective assistance of counsel is unexhausted. (Doc. 1, p. 17, Doc. 8, pp. 23-24). However, respondent contends that the ground is not procedurally defaulted because Archiquette could file in state court a Rule 3.800(a) motion to correct his sentence. (Doc. 8, p. 24) While a challenge to the sentence may still be available, respondent fails to recognize that Archiquette presents his claim as one of ineffective assistance of counsel. Archiquette cannot return to state court to file his ground of ineffective assistance of counsel in a second untimely Rule 3.850 motion. Consequently, this ground is unexhausted and procedurally defaulted. Recognizing the default, Archiquette asserts entitlement to a merits review under *Martinez*.

In his written plea agreement Archiquette specifically agreed to the following provision (Respondent's Exhibit 3, p. 3):

> In understand that my pleading guilty . . . will result in the Court imposing MANDATORY statutory costs. I also understand my plea may result in the Court imposing certain other costs and attorney's fees and I do not object to the imposition or amount of such costs and fees and I waive my right to a hearing on the imposition and amount of such costs and fees.

During the plea colloquy Archiquette averred that he had read the plea forms and understood all of the provisions therein. (Respondent's Exhibit 9, transcript of November 8, 2010, change of plea hearing, p. 7) He does not assert that that he did not understand this provision relating to costs and fees nor does he challenge the validity of either his guilty plea or the written plea agreement. Based on the language in the plea agreement, Archiquette fails to show that his trial counsel had a

reasonable basis upon which to object to the costs of either supervision or drug testing. Consequently, Archiquette fails to establish that his claim is "substantial" under *Martinez* to overcome the procedural default of this ground of ineffective assistance of counsel. He cannot meet the "fundamental miscarriage of justice" exception because he presents no "new reliable evidence" that he is actually innocent. *Schlup*, 513 U.S. at 327. Because Archiquette satisfies neither exception to procedural default, ground four is procedurally barred from federal review.

**Ground Five**

Archiquette contends that his post-conviction counsel rendered ineffective assistance by not objecting to "hearsay and speculative testimony that was material to [his] IAC claim alleging trial counsel should have called his psychiatrist for mitigation at sentencing." (Doc. 1, p. 18) Archiquette argues that "[t]he evidentiary hearing was a critical stage of Petitioner's case" and that "a favorable ruling on [his ineffective assistance of trial counsel claim] would have given the state court cause to order a resentencing for [his psychiatrist,] Dr. Siegrist[,] to testify and provide medical mitigation." (*Id*. at p. 20) Respondent contends that this ground is not cognizable in a federal habeas petition. (Doc. 8, p. 24) Archiquette replies that *Martinez* applies to permit a merits review of this ground.

*Martinez* does not permit review of a claim of ineffective assistance of post-conviction counsel. "By its own emphatic terms, the Supreme Court's decision in *Martinez* is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel." *Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013). Because ground five of Archiquette's federal petition alleges a claim of ineffective assistance of *post-conviction* counsel and not a claim of ineffective assistance of *trial* counsel, *Martinez* does not apply. *See Arthur v. Thomas*, 739 F.3d 611, 629–31 (11th Cir. 2014) (explaining

that *Martinez* only applies to the issue of cause to excuse the procedural default of an ineffective assistance of trial counsel claim that occurred in a state collateral proceeding), and *Lambrix v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 126263 (11th Cir. 2014) ("*Martinez* did not . . . create a freestanding claim for challenging a conviction or sentence based on the alleged ineffective assistance of state post-conviction counsel. . . . Thus, any attempt to investigate and present a claim for relief based on the ineffective assistance of state collateral counsel would be futile because a claim of ineffective assistance of state collateral counsel does not constitute a valid ground for habeas relief.") (citations omitted). Consequently, ground five warrants no relief.


II. <u>MERITS</u>

Archiquette's remaining two grounds are exhausted and entitled to a review on the merits.

**Ground One**

Archiquette contends that the "state courts violated [his] Fourteenth Amendment right to due process by refusing to rule on [his] Sixth Amendment claim alleging counsel failed to commission an independent psychiatrist for sentencing mitigation." (Doc. 1, p. 6) Archiquette claims that he "alleged in Ground Three(a) of his September 28, 2011[,] [Rule] 3.850 motion that trial counsel was ineffective for failing to commission an independent psychiatrist to provide medical mitigation testimony at sentencing if his psychiatrist was unwilling to testify." (Doc. 1, p. 26) He asserts that the state post-conviction court did not address this claim of ineffective assistance of counsel in the final order denying his third amended Rule 3.850 motion and, consequently, the claim remains unresolved. Respondent argues that this claim of ineffective assistance of counsel is unexhausted and procedurally barred because Archiquette "did not develop this claim on his 'Third Amended Postconviction Motion' . . . [but] explored the claim in the

motion for rehearing; however, developing an argument in rehearing is not a sufficient presentation of a claim for ruling by the postconviction court, nor does it preserve the claim for appeal." (Doc. 8, pp. 10–11)

Archiquette presented to the state post-conviction court in ground 3(a) of his third amended Rule 3.850 motion two separate bases for relief: (1) that his trial counsel rendered ineffective assistance at sentencing by not calling his psychiatrist, Dr. Joy Siegrist, as a witness, and (2) that his trial counsel rendered ineffective assistance by not commissioning "a forensic psychiatrist or similar professional to further [counsel's] investigation . . . and present psychiatric mitigating evidence." (Respondent's Exhibit 9, Archiquette's third amended Rule 3.850 motion, p. 22) In its final order denying Archiquette's Rule 3.850 motion the state post-conviction court addressed only the claim of ineffective assistance of counsel for not calling Dr. Siegrist as a witness. (Respondent's Exhibit 9a, final order denying Archiquette's Rule 3.850 motion, pp. 4–12) The state post-conviction court did not resolve the merits of the claim challenging trial counsel's failure to call an independent psychiatrist.

When a state court does not resolve the merits of a claim that was adequately presented to it by a petitioner, section 2254(d)(1)'s deference requirement does not apply. *Davis v. Sec'y for Dept. of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003), explains:

> As the Florida courts failed to resolve the merits of Davis's claim, the present controversy falls outside of § 2254(d)(1)'s requirement that we defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law. *See* [28 U.S.C. § 2254(d)(1)]; *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003) (When a state court denies relief by making an unreasonable application of the first prong of the test for ineffective assistance of counsel and thus never reaches the second prong, application of the second prong in federal habeas proceedings is *de novo*.); *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir. 2002)

(interpreting § 2254(d)(1)'s requirement of deference with respect to federal claims "adjudicated on the merits in State court proceedings" (internal quotation marks omitted)), *cert. denied*, 538 U.S. 906, 123 S. Ct. 1511, 155 L. Ed. 2d 225 (2003).

Accordingly, ground one of Archiquette's federal petition is reviewed *de novo*.

In his reply Archiquette alleges that his trial counsel's "strategic decision not to call Dr. Siegrist for mitigation . . . is precisely why an independent expert was necessary." (Doc. 15, p. 6) Archiquette asserts that testimony by an independent psychiatrist "on the abrupt withdrawal from one medication and the in[tro]duction of two others, all of which have severe side effects, could have reduced Petitioner's moral culpability for sentencing purposes . . . ." (*Id.*)

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (citations omitted).[6] *See also Sullivan v. Deloach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980) ("Th[e] prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often allegations of what a witness would have testified to are largely speculative.'"). Tactical decisions within the range of reasonable professional competence are not subject to collateral attack unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). In assessing a lawyer's performance, "[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Chandler*, 218

---

[6] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

F.3d at 1314. Trial counsel must decide which strategic and tactical option to pursue. *See, e.g., Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision . . . appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it."); *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*) ("[W]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision."). A habeas petitioner must overcome the presumption that counsel's conduct was a matter of strategy. *Strickland*, 466 U.S. at 689. A defendant's disagreement with counsel's tactics or strategy will not support a claim of ineffective assistance of counsel.

Archiquette's unsupported contention that counsel should have called an unnamed psychiatrist to testify, without more, is insufficient to warrant relief. *See, e.g., Bray v. Quarterman*, 265 F. App'x 296, 298 (5th Cir. 2008) ("To prevail on [a claim of ineffective assistance of counsel for failing to call a witness], the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."); *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted). "[M]ere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009). Archiquette fails to show that the outcome of his sentencing would have been different if trial counsel had called an independent psychiatrist to testify. *See Dorsey v. Chapman*, 262 F.3d 1181,

1186 (11th Cir. 2001) (holding that the petitioner did not establish ineffective assistance of counsel based on defense counsel's failure to call an expert witness because the petitioner failed to show that counsel's decision was so patently unreasonable that no competent attorney would have chosen that strategy), *cert. denied*, 535 U.S. 1000 (2002). Because he shows no prejudice, Archiquette's claim of ineffective assistance of counsel warrants no federal habeas relief because *Strickland's* requirements remain unsatisfied.

**Ground Two**

Archiquette contends that his trial counsel rendered ineffective assistance by not moving for a downward departure at sentencing. He argues that "counsel failed to conduct meaningful legal research to discover and argue Florida law to the sentencing court and that he suffered prejudice as a result because there was a substantial potential for a downward departure sentence." (Doc. 1, p. 8) The state post-conviction court granted Archiquette an evidentiary hearing on this ground. Archiquette claims that the state post-conviction court's order denying this ground "is confusing and inconsistent as to how [the court] arrived at its ultimate decision [to] deny" the ground and "did not adequately address the prejudice prong of *Strickland* . . . ." (*Id*. at p. 9) He further claims that "[t]his Court should give reduced deference to the state court's credibility determination" because "[t]he fact that counsel testified telephonically deprived the evidentiary hearing court of the normal human intuition judges use to weigh truthfulness." (Doc. 1, p. 8)

Archiquette testified on direct examination at the hearing as follows (Respondent's Exhibit 9b, transcript of May 28, 2015, hearing, pp. 6–7):

> Q: Okay. Once you became aware that there was going to be no plea deal available, did you begin discussions about downward departure?
>
> A: Yes.
>
> Q: Okay. And what did that discussion entail?

A: Well, I asked [counsel] many times, so I think over the course of a year, I was in Falkenburg Road jail for almost two years. And I asked her many times if she was going to argue for a downward departure sentence for me and she said, she assured me that, yes, that was a part of her trial strategy and then we get to sentencing and there was no argument made for downward departure.

Q: Did you ask her to file any motions on your behalf?

A: Just for downward departure.

Q: And did she discuss filing any motions on your behalf?

A: Well, she said she was going to move the court for a downward departure sentence.

Q: Okay.

A: And that was, again, that was part of her sentencing strategy was to ask the court for a downward departure sentence.

Archiquette further testified on cross-examination that his trial counsel retained Dr. Mark Ruiz to evaluate his case and that Dr. Ruiz testified on his behalf at sentencing as follows (Respondent's Exhibit 9b, transcript of May 28, 2015, hearing, pp. 8–10):

Q: Do you recall Dr. Ruiz testifying at your sentencing?

A: I did.

Q: Do you recall him discussing a prior diagnosis of PTSD?

A: Yes, ma'am.

Q: And prior treatments for alcoholism?

A: Yes, ma'am.

Q: Okay. So evidently at the sentencing it appeared [counsel] had done some efforts towards building your case for downward departure?

A: In that regard, I mean, she just - - to me, it seemed like she was laying more background in - - psychological background information on me; basically non-statutory

mitigation. And what I discovered is that there were a few statutory mitigat[ors] that were available to me and there was case law on point with those statutory mitigators that's - - that I alleged in my motion.

Q: But you would agree that the record of that sentencing transcript speaks for itself as to what [counsel] requested of the Court?

A: I don't remember requesting anything of the Court as far as downward departure sentence, ma'am.

Q: Okay. All right. Do you have a recollection of her presenting to the Court a sentencing memorandum?

A: No, ma'am.

Trial counsel testified on direct examination at the evidentiary hearing about her sentencing

strategy as follows (Respondent's Exhibit 9b, transcript of May 28, 2015, hearing, pp. 19–28):

Q: Okay. Can you please tell us when you had your discussions with Mr. Archiquette, did you attempt to learn anything about his background that you felt may be beneficial to either the defense or in mitigation of sentencing in this case?

A: Yes. I tried to learn everything about his background.

. . . .

Q: And had your experience been that Dr. Ruiz was familiar with what could be helpful in mitigation sentencing?

A: Yes. Yes, he was familiar with all the statutory mitigators.

. . . .

Q: Did Dr. Ruiz ultimately give you an opinion with regard to what he felt would be proper mitigation for Mr. Archiquette?

A: Yes.

Q: And can you tell the Court what that was?

A: Mr. Archiquette suffered from post-traumatic stress as well as a substance abuse issue.

Q: Did you ultimately call Dr. Ruiz at the sentencing hearing?

A: Yes.

Q: And did you have Dr. Ruiz testify to this PTSD mental disorder on the part of your client?

A: Yes.

Q: And did you have him testify to the substance abuse issues that your client had?

A: Yes.

Q: Did your client also testify at his sentencing?

A: Yes.

Q: And do you recall whether or not you had provided a memorandum to the Court in seeking a downward departure sentence?

A: Yes and - - to be clear, I was seeking a downward departure sentence but I was also really trying to prevent a very draconian sentence because Mr. Archiquette scored out to life in prison.

. . . .

Q: There's an allegation that you failed to argue certain statutory mitigators and I'd like to address those individually.

A: Yes.

Q: Specifically, with regard to the defendant's capacity to conform his conduct to the requirements of law was substantially impaired; do you have a recollection of how you approached that, if at all, in your sentencing argument?

A: I - - I don't know that I approached that head-on. I argued that he had PTSD, he had depression. He was going through marital problems. He was under a significant amount of stress because he was the breadwinner in the family but he also was the caretaker of the children, the primary caretaker of the children. And that, in short, he was going through a lot of difficult situations and that this situation happened as a result of all that.

Trial counsel further testified on cross-examination at the hearing as follows (Respondent's Exhibit 9b, transcript of May 28, 2015, hearing, pp. 32–35):

> Q: All right. I have a few questions for you regarding the sentencing memorandum that you sent to Judge Barber - -
>
> A: Yes.
>
> Q: - - prior to sentencing. Was that ever filed with the Court?
>
> A: It apparently was not. I spoke to [the assistant state attorney] and she said it was not part of the court file.
>
> Q: Okay. And would you agree that that was not a motion to downward depart, correct?
>
> A: That is correct.
>
> Q: So you never actually moved the Court to downward depart?
>
> A: I moved the Court to downward depart during the sentencing hearing but I did not file a written motion to downward depart. That is correct.
>
> Q: Did you ever explicitly ask the Court to downward depart?
>
> A: I was asking the Court for mercy. I don't know without looking at the transcript if I used the words "downward depart."
>
> Q: Okay. Did you ever cite to the Court any statutory mitigators that would be cause for a downward departure?
>
> A: Yes, I did, in the memorandum but I also - - I believe that that was implicit in the presentation that we made to the Court.
>
> Q: Okay. You say that it was implicit but did you ever explicitly point to those statutes; statutory mitigators?
>
> A: I did in the memorandum. I don't know that - - without looking at the transcript right this second, I don't know that I verbally said, "Your Honor, look at statute number X and this applies."

Q: So in this case you would rely on the transcripts to - -

A: I would rely on the transcripts and the sentencing memorandum.

Q: Okay.

A: Which the judge, I guess, said that he had read on the record. I don't know why it wasn't filed as part of the court file.

Q: Okay. Did you do any kind of legal research prior to the sentencing?

A: Yes, and I was - - well, I mean, I was familiar with the statutory mitigators at that point and I was familiar with sentencing law at that point. So I didn't have to do particular research into it *per se* but I looked at the statute - -

Q: Okay.

A: - - while I was writing the memorandum.

Q: You testified earlier that you were more concerned about Mr. Archiquette receiving a life sentence and not about asking for a downward departure. Is that a fair and accurate statement?

A: That is far and accurate, yeah.

Q: Okay.

A: I mean, I was concerned that he was going to get a life sentence.

Q: Okay. So you were more concerned arguing against a life sentence and not arguing for a downward departure, correct?

A: That was - - I think that that's a correct characterization, yes. Like, I wanted him to get the best possible sentence but the largest danger in my mind was a life sentence - -

Q: Okay, you would agree - -

A: - - which the State was arguing for.

Q: You would agree that there are some statutory mitigators that would apply to Mr. Archiquette, correct?

A: Yes.

Q: Okay. And are you aware there's case law on point that would actually support the statutory mitigators?

A: I, sitting here today, I don't. I don't. I can't speak to that.

Q: Okay, but you did say that you did some legal research prior to sentencing, correct?

A: And reading the plain face of the statute, you can see that they apply.

Q: Okay. So you didn't actually look for case law on point, did you?

A: I don't think so. It was several years ago but I don't - - I think that they applied.

The state post-conviction court denied this ground of ineffective assistance of counsel after

the evidentiary hearing as follows (Respondent's Exhibit 9a, final order denying ground three of

Rule 3.850 motion, pp. 12–20):

> Defendant alleges ineffective assistance of counsel for failure to move the court to consider the following statutory mitigators applicable in Defendant's case:
>
> > 1) Fla. Stat. 921.0026(2).(c) - The capacity of the defendant to appreciate the criminal nature of the conduct or to conform that conduct to the requirements of law was substantially impaired . . . 2.) Fla. Stat. 921.0026(2)(d) - The defendant requires specialized treatment for a mental disorder that is unrelated to substance abuse or addiction or for a physical disability, and the defendant is amenable to treatment . . . [and] 3.) Fla. Stat. 921.0026(2)(j) - The offense was committed in an unsophisticated manner and was an isolated incident for which the Defendant has shown remorse.
>
> Defendant contends . . . that had counsel moved the court to consider these statutory mitigators, counsel could have successfully moved for a downward departure in this case:

Counsel had three mitigators available to her [] and an available expert witness to move the court for a downward departure sentence based on statutory, non-statutory and decisional law but inexplicably did not. The trial court only needed one to justify a downward departure sentence. It's not that counsel wasn't prompted to, the Defendant asked her countless times if she was going to ask for a downward departure sentence and she assured him and his family that this was a part of her sentencing strategy. In anticipating an emotionally charged sentencing hearing, counsel should have moved the court by motion or sentencing memorandum within the ninety days between the plea hearing and the sentencing hearing as to not appear insensitive at the time. Judge Barber foreshadowed, in the beginning of the sentencing proceedings, that he was not going to give the Defendant a maximum sentence and referred to a church play whose message was forgiveness. Judge Barber ultimately gave him a bottom of the guidelines prison sentence. It is likely based on Judge Barber's comments and sentence imposed that he would have considered a downward departure sentence had counsel opened the door for him. But she did not, to the Defendant's substantial prejudice and denied him his substantive and procedural rights. When counsel was called to submit closing argument she seemed to be caught off guard and had no prepared final remarks, this was her final opportunity to advocate for the Defendant which she did not, according to the record transcripts. Ms. Doherty also told the Defendant after sentencing that during a discussion with [D]etective Glyder, the lead investigator in the Defendant's case, that he even acknowledged that the medication switch was most likely the cause and not alcohol. Any reasonable jurist when reviewing Ms. Doherty's performance through the lens of advocacy will discover

that she presented only "bare-bones" mitigation when so much more was available.

At the May 28, 2015, evidentiary hearing, Defendant testified he discussed with her several times about asking for a downward departure at sentencing. He admitted he understood there were no plea deals available to him. He testified Ms. Doherty assured him that asking for a downward departure sentence was part of her trial strategy. However, he testified at sentencing, she did not make any argument for a downward departure.

On cross-examination, he admitted they discussed her need to collect certain records for investigation. He admitted he executed some releases for medical records. He admitted she retained psychologist Dr. Mark Ruiz to evaluate his case. He admitted that Dr. Ruiz testified at his sentencing hearing.

He admitted that Dr. Ruiz testified regarding a prior diagnosis of PTSD and prior treatments for alcoholism. He testified, "I don't remember requesting anything of the Court as far as downward departure sentence, ma'am." He denied any recollection of her providing the Court with a sentencing memorandum.

At the same hearing, Ms. Maura Doherty testified regarding her training and experience in criminal law. She admitted she represented Defendant on several counts of DUI, DUI manslaughter, and vehicular homicide. She admitted at one point during her representation of Defendant, they considered the possibility of Defendant entering a plea in this case and how to proceed at sentencing. When asked about how early in the case that began, Ms. Doherty responded as follows:

> DOHERTY: That would not have been begun very early in the case because it was a very - - it's a very serious case. So we - - it wasn't a situation where we discussed pleas early on in the case. I took a significant amount of depositions in the case; went out to the scene of the alleged offense and did a lot of work on it before we talked about that. Now I probably told him early on in the case that there are essentially three ways that a case can be resolved, you know, with a trial or with an open plea or with a negotiated plea,

but we didn't discuss any particular ways of
doing that early in the case.

She admitted there were several accidents that were part of
her investigation in preparation for his defense. She testified,
"[a] large part of the preparation of the defense was figuring
out what happened, or trying to figure out what happened."
She admitted Defendant entered his plea on November 8,
2010. She testified [that she] tried to learn everything about
his background.

She testified Defendant advised her that his parents were
divorced, and he was in his forties when that occurred. She
testified she knew he had gone to the Town and Country
detox and had been under the care of a psychiatrist. She
admitted she obtained records from the Town and Country
detox regarding his hospitalization in 2008.

She further testified she knew he was getting treatment from
December 2008 through April of 2009, at a Tampa Pain
Relief Center pain clinic for a back injury he received while
in the military. She testified although she could not recall
whether she obtained records from that clinic, she did have
the pharmacy record. She also testified she obtained records
from psychiatrist Dr. Joyce Seagr[i]st who he was seeing.
She admitted Dr. Siegrist provided her with the requested
records.

She testified she reviewed the records and discussed them
with Defendant. She testified she did not believe Dr. Siegrist
was going to be beneficial to Defendant's defense or
mitigation in his case, and further testified as follows:

> DOHERTY: Well, with respect to the
> defense of the case, all she could testify - - I
> would never put her on as a defense attorney.
> She would have testified to the fact that Mr.
> Archiquette was putting - - was taking drugs
> at work, potentially mood or - - mood
> altering, which would be part of the State's
> burden to prove that he was under the
> influence of something at the time of the
> offense. The other - - with respect to
> mitigation, we had her records. I hired an
> expert. My expert looked at her records with
> respect to his diagnoses and what types of
> things he was on at the time. All she would

> have testified to is that she prescribed anti-depressants and sleep aids, and stuff like that.
>
> . . . .
>
> I believe Benzodiazepine (ph) and Xanax or Ativan.

She admitted the allegations against Defendant were that. he had both alcohol and various types of medications in his system at the time of the accidents.

She admitted two blood draws were taken, one upon his arrival at the hospital and a subsequent legal draw. She admitted the legal draw was the one that reflected the lower alcohol content in the blood. She admitted she had to consider the fact that Defendant also had alcohol in his system. She testified Dr. Siegrist's notes reflected that she told Defendant he should not drink alcohol with the medication. She admitted that was part of her decision not to call [Dr. Siegrist] because she could not help his defense.

When asked if she discussed with Defendant the inadvisability of calling Dr. Seagrist, [trial counsel] responded as follows:

> DOHERTY: I talked to him about Dr. Seagr[i]st. I talked to him about what my findings were in terms of calling her. There was - - you made reference to the fact that there were two different places I could have called her. I could have called her as a witness in a trial or I could have called her as a witness in mitigation. And I didn't think that she fit into either of those categories as somebody who would be particularly useful to us because she would be subject to cross-examination on whether or not she advised him that he was not to drink alcohol on these medications.

[Trial counsel] testified she retained psychologist Dr. Mark Ruiz who was familiar with all the statutory mitigators. She testified she wrote Dr. Ruiz a letter, advised him to pay attention to particular things, and provided him with the medical records she had, including Dr. Siegrist's records. She testified Dr. Ruiz opined that Defendant suffered from

post-traumatic stress and substance abuse. She testified she called Dr. Ruiz to testify at Defendant's sentencing hearing and he testified about Defendant's PTSD mental disorder and his substance abuse issues.

She admitted that Defendant testified during the sentencing hearing. She admitted to providing the Court with a sentencing memorandum seeking a downward departure sentence and trying to prevent a very draconian sentence because Defendant scored out to life. She testified, "[s]o the way I would have structured my argument was arguing for a downward departure, but also arguing for mercy to prevent a life sentence." She further testified, "[m]y greatest concern walking into that sentencing hearing and throughout it, was that Randy was going to get life in prison or get the functional equivalent of life in prison. The victim's family wanted life in prison."

When asked about the statutory mitigator regarding [whether] Defendant's capacity to conform his conduct to the requirements of the law was substantially impaired, and how she approached it, if at all, during her sentencing argument, she responded as follows:

> DOHERTY: I -- I don't know that I approached that head-on. I argued that he had PTSD; he had depression. He was going through marital problems. He was under a significant amount of stress because he was the breadwinner in the family but he also was the caretaker of the children; the primary caretaker of the children. And that, in short, he was going through a lot of difficult situations and that this situation happened as a result of all that.

She testified Defendant suffered from PTSD and depression. She testified, "I would have argued that they were apart from substance abuse, but I believe that they are usually related to each other." She testified she believed she argued in the sentencing memorandum that the crime was committed in an unsophisticated manner because it was his first offense and that []he has shown remorse.

When asked about the tenor of the courtroom during the sentencing proceedings, she responded as follows:

DOHERTY: It was - - it was terrible as you can imagine. There were two victims. One was an older woman and one was a very young woman and their families were there. They had retained civil counsel who was also there. Mothers Against Drunk Driving was there, Victim's Assistance from the State Attorney's Officer was there. It was a packed courtroom and it was an incredibl[y] hostile environment in my opinion. I - - I now do capital work and I've handled a lot of sex offenses and a lot of really terrible situations; a lot of people who have been devastated in their lives as a result of different incidents. This was - - this was probably the most hostile situation that I've seen.

She admitted she conveyed to the Court Defendant's remorse. She admitted Defendant did not have a prior record. She admitted Defendant's sentencing memorandum was the document she provided to Judge Barber prior to sentencing.

On cross-examination Ms. Doherty testified apparently the sentencing memorandum was never filed [with] the Court because she learned from [the assistant state attorney] that it was not a part of the court file. She admitted the sentencing memorandum was not a motion to downward depart. She testified, "I moved the Court to downward depart during the sentencing hearing but I did not file a written motion to downward depart." She testified she asked the Court for mercy.

She admitted she cited statutory mitigators in the sentencing memorandum and it was implicit in the presentation she made to the Court. She testified the judge stated on the record that he read the sentencing memorandum. She admitted she was more concerned about Defendant receiving a life sentence and not about asking for a downward departure and clarified her statement with, "I mean, I was concerned that he was going to get a life sentence." She admitted there were some statutory mitigators that applied to Defendant.

After reviewing the allegations, the testimony, evidence, and arguments presented at the May 28, 2015, evidentiary hearing, Defendant's written closing argument, the court file, and the record, the Court finds Ms. Doherty credible.

Therefore, the Court finds Ms. Doherty called Dr. Ruiz at the sentencing hearing who testified that Defendant suffered from post-traumatic stress and substance abuse. The Court finds Ms. Doherty provided the Court with a sentencing memorandum arguing in support of statutory mitigators,[7] which the Court acknowledged at sentencing that he read

---

[7] Although the sentencing memorandum was not part of the record in the state post-conviction proceedings and was not considered by the state post-conviction court in rejecting Archiquette's claim of ineffective assistance of counsel, the State has submitted a copy of the memorandum with the response to Archiquette's federal petition. The memorandum supports the post-conviction court's factual finding that trial counsel argued in support of statutory mitigation. The sentencing memorandum includes the following (Respondent's Exhibit 9a, February 7, 2011, sentencing memorandum, pp. 5–6) (emphasis in original):

Florida Statute § 921.0026(2) contemplates mitigating circumstances under which a departure from the lowest permissible sentence is reasonably justified. We believe the following mitigators apply and merit your consideration:

(i)     The defendant cooperated with the state to resolve the current offense or any other offense.

With the plea of guilty he has entered in this case, Randy has taken full responsibility for his actions and has illustrated to the court that he hopes to bring closure to this horrible tragedy without prolonging the suffering of any of the parties involved.

(ii)    The offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse.

Randy did not intend to cause these traffic accidents. There is no evidence to suggest that there was any pre-conceived planning or premeditation in these incidents. In addition, he has no prior criminal history. Randy has expressed his deep sadness and remorse to his attorneys. At the direction of his legal counsel, Randy has remained silent until his sentencing date. However, he has written a statement that he intends to read at sentencing expressing his remorse and grief of the accidents.

Mitigators to consider under § 921.0026(1), *(mitigating actors to be considered include, but are not limited to, those listed in subsection (2))* support and permit consideration of a downward departure:

1.    Randy Archiquette has no prior criminal history.

2.    Randy Archiquette has a loving family who will support him in obtaining treatment, employment and stability if he is released from incarceration.

3.    Randy Archiquette is the father of two young daughters. Although he knows that he cannot participate in their lives in the same way anymore, he would like to be out of custody one day to spend time with them and make up for what they lost.

4.    Randy Archiquette served his country honorably in several overseas deployments.

5.    Randy Archiquette cooperated with the insurance company and tried to assist the MacFarland and Williams families in settling their civil actions against him. Both civil actions have settled as of the present time.

. . . .

We ask that the above-listed mitigating factors be considered at Mr. Archiquette's sentencing.

and Ms. Doherty argued at sentencing in support of said mitigators. Consequently, the Court finds Defendant cannot prove that Ms. Doherty acted deficiently or any resulting prejudice when she provided the Court with a sentencing memorandum in support of statutory mitigators, which the Court acknowledged at sentencing that he read[8] and Ms. Doherty argued at sentencing in support of said mitigators. As such, no relief is warranted upon [this] ground . . . .

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016). A question of the credibility and demeanor of a witness is a question of fact. *See Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (citing *Freund v. Butterworth*, 165 F.3d .939, 862 (11th Cir. 1999) (*en banc*)). Under Section 2254(e)(1), "[f]ederal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence." *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (*en banc*). *See also Devier v. Zant*, 3 F.3d 1445, 1456 (11th Cir. 1993) ("Findings by the state court concerning historical facts and assessments of witness credibility are . . . entitled to the same presumption accorded finding of fact under 28 U.S.C. § 2254(d)."), *cert. denied*, 513 U.S. 1161 (1995). "Determining the credibility of witnesses is the province and function of state courts, not a federal court engaging in habeas review. Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor was observed by the state court, but not by them.'" *Consalvo*, 664 F.3d at 845 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). This deference applies to a credibility determination that resolves conflicting testimony. *See Baldwin v. Johnson*, 152 F.3d 1304, 1316 (11th Cir. 1998)

---

[8] The judge acknowledged at the sentencing hearing that "the public defender has given me a sentencing memorandum which I've read . . . ." (Respondent's Exhibit 9, transcript of February 11, 2011, sentencing hearing, p. 5)

("We must accept the state court's credibility determination and thus credit [the attorney's] testimony over" the applicant's testimony."); *cert. denied*, 526 U.S. 1047 (1999). The deference is heightened when reviewing a credibility determination in a Section 2254 application. *Gore v. Sec'y, Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007), *cert. denied*, 552 U.S. 1190 (2008). *Accord Kurtz v. Warden, Calhoun State Prison*, 541 F. App'x 927, 929 (11th Cir. 2013) ("'A certain amount of deference is always given to a trial court's credibility determinations' and a credibility determination in a case on habeas review receives heightened deference.") (quoting *Gore*, 492 F.3d at 1300), *cert. denied sub nom, Kurtz v. Jeanes*, 134 S. Ct. 2728 (2014)). The state court's credibility determination is presumed correct. *See Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("Reasonable minds reviewing the record might disagree about the [witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

The state post-conviction court found counsel more credible than Archiquette. Archiquette has not shown, by clear and convincing evidence, that the state court's credibility determination was unreasonable. *See Jones*, 540 F.3d at 1288 n.5. Archiquette does not deny that the sentencing memorandum included argument for a downward departure based on specific statutory mitigators. He fails to meet his burden of rebutting with clear and convincing evidence the presumption of correctness afforded the state post-conviction court's credibility determination. 28 U.S.C. § 2254(e)(1). The state courts' rejection of this ground of ineffective assistance of trial counsel was neither contrary to, or an unreasonable application of, *Strickland,* nor was the ruling based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(1), (d)(2). Ground two warrants no relief.

Accordingly, Archiquette's petition for the writ of habeas corpus (Doc. 1) is **DENIED**. The clerk shall enter a judgment against Archiquette and **CLOSE** this case.

## DENIAL OF BOTH A
## CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

**IT IS FURTHER ORDERED** that Archiquette is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability ("COA"). Section 2253(c)(2) limits the issuing of a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Archiquette must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would not debate either the merits of the claims or the procedural issues, Archiquette is entitled to neither a certificate of appealability nor leave to appeal *in forma pauperis*.

Accordingly, a Certificate of Appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Archiquette must obtain permission from the circuit court to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida this 26th day of November, 2019.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

All parties of record including unrepresented parties, if any